## J. F. HOWELL et al. v. WALKER D. HINES, Director General of Railroads, Appellant.

### Division One, April 6, 1923.

1. **INTERSTATE SHIPMENT: Delay in Furnishing Cars: Written Contract Waiving Prior Agreement.** An agreement in the bill of lading, signed by both the carrier and shipper on the 19th of the month, that "all prior contracts, agreements and understandings, whether verbal or written, relating in any manner to the receipt and transportation of the live stock described herein, or the furnishing of cars therefor, are hereby waived by the shipper and are merged in this agreement," does not relieve the carrier from its negligent failure to furnish until the 19th, cars agreed on the 12th, to be furnished on the 18th.

2. ———: ———: ———: **Carmack Amendment.** Under the Carmack Amendment of 1906 to the Interstate Commerce Act of 1887 it is not within the power of a railroad company, without a valuable consideration, to make a contract exempting itself from liability

Howell v. Hines.

for damages resulting from its own negligence or unlawful act in the handling of interstate shipments.

3. ———: ———: ———: ———: **Meaning of Existing Law.** The Carmack Amendment of 1906 to the Interstate Commerce Act of 1887 expressly declared that "no contract, receipt, rule or regulation shall exempt such common carrier" from liability for "any loss, damage or injury," caused by it to property delivered to it, and to that was added the proviso that nothing therein should deprive the holder of a bill of lading "of any remedy or right of action which he has under existing law;" and those words not only deprive a railroad company of power, except upon a reduction of rates or some other valuable consideration, to contract against its own negligence, but the words "existing law" mean the law of the land, and cannot be construed to mean any limitation of liability which the carrier may choose to insert in the bill of lading or as a withdrawal of all state legislation regulating interstate commerce.

4. ———: ———: **Date of Order: Substantial Evidence.** The evidence in this case was substantial that the cars were ordered on the 12th of the month to be furnished on the 18th, and not on the 18th after the stock were brought to the station for shipment; and, being substantial, the verdict of the jury is not disturbed.

5. ———: ———: **Negligent Failure: Demand and Supply of Cars.** Where cars for the shipment of hogs were ordered on the 12th of the month, to be furnished on the 18th, proof that they were not furnished until the 19th is sufficient to establish prima-facie the carrier's negligence, it being usual to make such orders three or four days ahead of the shipment. If an order made six days ahead of the shipment date did not allow the carrier sufficient time to furnish the cars, it is its duty to show the time allowed was insufficient; it is not the duty of the shipper to show that the demand and supply of cars over the entire line did not require an earlier order, since such evidence is peculiarly within the reach and control of the carrier.

6. **DAMAGES: Decrease in Market Price of Stock: Testimony of Shipper: Hearsay.** The market price of stock, bought and sold on an open market, established, maintained and used for that purpose, is a fact to be proved like any other fact of a similar nature, the price being fixed by the manifold transactions occurring from day to day; and a shipper whose business requires him to keep posted upon the price of hogs, and who gets his information from a stock journal published at the distant stockyards and letters from commission men, can testify as to the market value on the day they were shipped, the day they reached the market and the day they were sold.

Transferred from Kansas City Court of Appeals.

AFFIRMED.

· *McBaine, Clark & Rollins* for appellant.

(1) The lower court should have directed the jury to return a verdict for appellant as requested, because there is absolutely no evidence that the cars were not furnished on account of the negligence of the carrier. Plaintiffs, as was necessary to state a cause of action, alleged negligence in their petition, but failed to prove it. They therefore failed to prove the cause of action alleged. Ficklin v. Railroad, 117 Mo. App. 211; Raper v. Lusk, 192 Mo. App. 378; Huston Brothers v. Railroad, 63 Mo. App. 671; McNear-Talbot & Johnson v. Chesapeake & Ohio Ry. Co., 86 S. E. (W. Va.) 887; Ballentine v. Railroad Co., 40 Mo. 491. (2) Respondents by signing the live stock contract introduced in evidence waived any claim they might have had for damages on account of the failure of appellant to furnish cars. This was an interstate shipment of live stock and the waiver provision of the contract was valid and binding. 10 C. J. 136; Adams Express Co. v. Croueger, 226 U. S. 491, 53 Sup. Ct. 148, 44 L. R. A. (N. S.) 257; Missouri, Kansas & Texas Ry. Co. v. Harriman Bros., 227 U. S. 657, 57 L. Ed. 690; Thomas Bros. v. Railroad, 188 Mo. App. 22; Donevan v. Wells Fargo, 265 Mo. 300; Blair-Baker Horse Co. v. Railway, 200 S. W. 109; O'Briant v. Pryor, 195 S. W. 759; Smith v. Railroad, 186 Mo. App. 401; Coleman v. Hines, 217 S. W. 602; Aull v. Railroad, 136 Mo. App. 291; Johnson v. Mo. Pac., 187 S. W. 282; Hamilton v. Railroad, 177 Mo. App. 145. (3) The plaintiffs failed to show that the car was not furnished as ordered. Witness J. F. Howell testified that appellant's agent entered the order in the order book, and identified the order book which was introduced in evidence. The entries in the order book showed the cars were not ordered until November 18th and not on November 12th as contended by

Mr. Howell.  Plaintiffs made no attempt to explain the date of the entry in the order book.  They failed to prove their case.  McNear-Talbot & Johnson v. Chesapeake & Ohio Ry. Co., 86 S. E. (W. Va.) 890.  (4)  The court erred in permitting witness Howell to testify to the market price of the hogs from hearsay.  Fountain v. Railroad, 114 Mo. App. 676.  (5)  The trial court committed error in permitting plaintiffs to prove that other cars ordered at other stations on the Wabash line were furnished by appellant to plaintiff on the same date. This was prejudicial error.  Osborne v. Syster, 195 Mo. App. 520; Heffernan v. Neumond, 198 Mo. App. 667; Bovard v. Mergenthaler Linotype Co., 209 S. W. 965.

*N. T. Gentry* for respondents.

(1)  A carrier is liable in damages for failure to furnish a car to a shipper, when ordered within a reasonable time.  Baker v. Railroad, 145 Mo. App. 197; Britton v. Railroad, 167 Mo. App. 78; Hines v. Mason, 221 S. W. (Ark.) 861; Railroad v. Crain, 224 S. W. (Okla.) 1064; Howell v. Hines, 236 S. W. (Mo. App.) 886; Grass v. Railroad, 238 S. W. (Mo. App.) 551.  Three days constitute a reasonable time for the carrier to furnish a car to a shipper.  Payne v. Mallory, 230 S. W. (Ark.) 270. Judgment may be rendered against the Director General of railroads for failure to furnish a car.  Railroad v. Walker, 234 S. W. (Ark.) 619.  (2)  A stipulation in a live stock contract, waiving damages on account of a prior written or oral contract, does not waive damages for failure, to furnish cars when ordered.  Cases supra, and Thee v. Railroad, 233 S. W. (Mo. App.) 959.  There was no consideration for the alleged release and waiver. (3)  Plaintiff was a regular shipper from Boone county for twenty-five or thirty years; and, like all other shippers, made it a part of his business to keep posted on the value of hogs, both in St. Louis and in Columbia. He received daily advices from St. Louis commission men on the hog market, he was a reader of the Live

Stock Reporter and talked to his son (plaintiff Murry Howell) about the price of hogs at the St. Louis market on those two days; and his son was at the market on those days. In what other way could a hog buyer and shipper become acquainted with the market value of hogs? If he had been at the market in St. Louis, he would of necessity have to take the statement of other hog buyers and salesmen, regarding the sales and prices; for he could not be present at all of them. It could not be insisted that the law requires a dealer in live stock to be present and actually see sales of live stock, and see the money pass from one man to another, in order to know the market value of such live stock. Sisson v. Railroad, 14 Mich. 497; Lush v. Druse, 4 Wend. 313; Mt. Vernon Co. v. Teschner, 108 Md. 168; Railroad v. Pearce, 101 S. W. 762, 82 Ark. 353; Peters v. McPhadden, 75 Wash. 527, 135 Pac. 26. "It is the experience that the witness acquires in the ordinary conduct of affairs and from means of information, such as are usually relied on by men engaged in business for the conduct of that business, that qualifies the witness to testify." Whitney v. Thatcher, 117 Mass. 523; Lawrent v. Vaughn, 30 Vt. 90; Note 12 Ann. Cas. 128; 3 Wigmore on Evid. sec. 1704. Quotations of prices as shown by a newspaper are admissible in evidence, as the court knows that that is the usual way the business of the country is carried on. Nash v. Classen, 163 Ill. 409; 17 Cyc. 425. In a suit for damages, resulting from failure to deliver lambs, the court admitted in evidence the market reports, as shown in a newspaper called "Live Stock Review," published in the city, showing the quotations on the day of the alleged breach. Rulls v. Young, 98 Mich. 231. (4) Defendant was not prejudiced by the admission of the evidence of the plaintiff J. F. Howell, but rather was helped thereby. Plaintiff Murry Howell testified that he was at the market in St. Louis and at National Stock Yards on those two days, and that the market price of hogs of this character was from fifty to seventy-five cents per hundred lower on the 20th of November than on the 19th of November.

So the evidence of plaintiff J. F. Howell, to which defendant now makes objection, was actually helpful to defendant; and defendant cannot be heard to complain of it.  McMickel v. Railroad, 209 S. W. 613.  (4)  Defendant should not now be heard to complain for another reason.  All of the evidence shows that there was a decline in the market, and the matter was not questioned by defendant in the trial court; it offered no evidence whatever to contradict the testimony of both plaintiffs thereon, although ample opportunity was given defendant to procure such evidence.  The case was tried on the theory that there was a decline in the market value of the hogs; hence defendant cannot now assume a contradictory position and claim that there was no decline. (5)  The chief defense interposed in the trial court was that plaintiffs had suffered damage by reason of the failure to furnish the cars at the Columbia station on the 18th of November, but that plaintiff had waived such damages by executing a written contract for the shipment of the hogs on the 19th of November.  Hence defendant's objection to the alleged hearsay evidence is frivolous.

BROWN, C.—This is a suit to recover damages against the defendant in charge of the Wabash Railroad as Director General of Railroads for the Government, for failure to furnish cars for the transportation of three carloads of hogs from Columbia, Missouri, to the National Stock Yards in Illinois, within a reasonable time after the request or order therefor had been given by the plaintiffs, who were extensive dealers in and shippers of live stock in that portion of the State under the name of J. F. Howell & Son.

The petition states that the order was given to the agent of the company at Columbia, on November 12, 1919, for the delivery of three cars for the purpose of this shipment, for loading at that station on the 18th of the same month, and was duly accepted.  The defendant, by answer, denies that the cars were ordered on the 12th, but

alleges and asserts that the order was not given until November 18th, and that the cars were delivered for loading promptly and on the next day. He also pleads in bar a written contract in the nature of a bill of lading, signed by both parties and containing the following clause: "All prior contracts, agreements and understandings, whether verbal or written, relating in any manner to the receipt or transportation of live stock described herein or the furnishing of cars therefor, are hereby waived by the shipper and are merged in this agreement." This contract is dated on the 19th and was signed with the name of J. F. Howell & Son by one of the three boys who were to and did accompany the shipment to its destination as caretakers, and the shipment moved on the same day and proceeded to its destination in Illinois.

Two defenses are interposed to defeat recovery. (1) That no negligence in the furnishing of cars for the shipment is shown by the evidence; (2) that the plaintiffs, by the clause which we have quoted from the contract of shipment, waived any negligence with which the defendant might have been charged with respect to delay in the furnishing of the cars. The precise point involved in this defense is founded on the charge that the cars were not ordered on November 12th as stated by plaintiffs, but were ordered on November 18th, and were promptly delivered the next day.

There were three identical contracts covering this shipment—one for each carload—differing only in the initials and number of the cars and the number of animals in the respective cars. The partnership name of plaintiffs was signed to each by the caretaker assigned to the particular car, and served as his transportation upon the train in which the cars were included.

The damage asked in the petition is alleged to have resulted from the loss in weight of the hogs necessarily resulting from the delay of the shipment by the failure to deliver the cars when ordered, the cost of corn fed them during that time, and decline in the market price

of hogs at the National Stock Yards between the 19th of November, the date at which they would have been sold on the market had the cars been delivered at Columbia on the 18th, and the 20th of November, the date of their arrival in that market. The hogs were delivered at the defendant's pens ready for shipment upon the defendant's train on the 18th, but by reason of the failure to deliver the cars on that date were not loaded and put in that train, but were detained until the next day.

The defendant's line of railway extends from Columbia to St. Louis through Stephens, Hallsville and Centralia, Moberly being the division point on the road to St. Louis and the National Stock Yards. The distance from Columbia to Moberly, the office of the division superintendent by whom cars were distributed to the various stations on the Columbia line, was forty-six miles. From Columbia orders for cars were telephoned by the station agents to that office. Mr. J. F. Howell testified that on the 12th he called at the Columbia office and ordered three cars to be delivered at that station, one car for Stephens and two cars for Hallsville, all to be delivered for loading on the morning of the 18th. No question is raised as to the sufficiency of the time allowed for this delivery, and Mr. Howell stated in his testimony that the car for Hallsville might have been ordered through that station, but he thinks that the car for Stephens was ordered by him through Columbia. It was furnished as ordered. He also testified positively that he himself ordered the three cars for this shipment of hogs on the 12th day of November for delivery and loading on the 18th, and that Mr. Dunning wrote it down at the time in an order book. The defendant introduced the page or pages of an order book on which Mr. Dunning testified that car orders for November were entered as taken, which shows no order for these three cars until the 18th, on which day there seems to be no question in the evidence that these hogs had been driven to the station for loading, and that the question was then raised as to the failure to have the cars for them ready, and

was discussed not only with the employees handling those matters at that point, but that Mr. J. F. Howell was directed to the telephone at the passenger station to take the matter up with the superintendent at Moberly, which he did. The hog-car ordered by the Howells for delivery on the 18th at Stephens was furnished on that day, as were also the two cars for hogs at Hallsville. Mr. Dunning testified and the order book shows, that Murry Howell ordered the three cars in which this shipment was finally made, at Columbia, on the 18th, but he was on that date, as well as the two succeeding days, at the National Stock Yards. The only sure thing developed by this testimony, as well as all testimony upon the same subject, is that Mr. J. F. Howell came to Columbia on the 18th with 257 hogs, for the shipment of which he states that he had, on the 12th, ordered three cars which were not there, and that the hogs had been kept over until the cars could be procured for their transportation on the next day.

J. F. Howell was permitted, against the objection of the defendant, to testify from information received through the market quotations in the live stock journal published at the National Stock Yards and letters from brokers dealing in that market, that the market price of hogs declined fifty cents per hundred weight from the 19th of November to the 20th, when these hogs were sold. To this ruling exceptions were duly saved. Murry Howell, who was, during all that time, present at the National Stock Yards as a trader in the same market, testified that hogs declined from fifty cents to seventy-five cents per hundred weight, without objection. Other facts in evidence may be stated as necessary in the course of the opinion.

There was a verdict and judgment for $409.10.

I. The most important question presented by this appeal relates to the purpose, meaning and legal effect of the following clause found in the bill of lading issued by the defendant to the plaintiffs under date of November 19, 1919:

*Limiting Liability by Contract.*

"Section 8. All prior contracts, agreements and understandings, whether verbal or written, relating in any manner to the receipt or transportation of the live stock described herein, or the furnishing of cars therefor, are hereby waived by the shipper and are merged in this agreement."

The purpose of the suit is to recover damages for the alleged negligent failure of the defendant to furnish cars at its Columbia station on the 18th of November, for the loading and shipment of three carloads of hogs on that date. The defendant pleads that by the terms of this clause in the bill of lading, the plaintiffs waived any cause of action they had or might have had for failure to furnish cars for the shipment of the same hogs on the previous day.

That we may have before us the precise question involved, we will say that the position taken by plaintiffs is that cars for this shipment were ordered on November 12th for loading on the 18th, and that the order was accepted by defendant in those terms, and that the cars were not furnished on that date. That upon the faith of such order and acceptance the plaintiffs drove their hogs to Columbia, and placed them in the defendant's pens and held them while the defendant procured the necessary cars, three in number, on the next day. The defendant's position is that no order for cars had been given by plaintiffs on the 12th, but that the cars were first ordered on the 18th, and that they were promptly delivered on the next day. The case therefore stands upon the question whether these cars were ordered on the 12th, for delivery at the loading chutes on the 18th. If so it is plain that the cause of action, if any there be, accrued and was complete, and that the subsequent order and its execution could only operate upon the rights of the parties by way of liquidating the damages. This being an interstate shipment, the rights and duties of the respective parties are fixed by the Federal statute then in force, and counsel cite us to what is commonly known as the Carmack amendment of June 29, 1906, of

the Interstate Commerce Act of 1887, to sustain their contention that the provision contained in that amendment imposing the duty to issue a bill of lading, authorized defendant to exact a waiver of any injury already suffered by plaintiffs by reason of the negligent failure of defendant to furnish cars for the shipment of the same stock on the 18th of November.

The words of the amendment to which this effect is attributed are as follows: "That any common carrier, railroad or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." In due time this amendment became the subject of much litigation, which naturally and inevitably found its way to the Supreme Court of the United States, the final judicial authority upon all Federal questions, and it was held, substantially, that the Carmack amendment evinced the legislative intention that, in all matters relating to interstate carriage by railroads, the act should afford the criterion by which the rights and duties of both shipper and carrier should be ascertained, irrespective of the laws of any state in which the traffic might originate, or through or into which it might pass in transit. [Adams Express Co. v. Croninger, 226 U. S. 491; M., K. & T. Ry. v. Harriman, 227 U. S. 657; B. & O. Ry. Co. v. Leach, 249 U. S. 217; St. L., I. M. & So. Ry. Co. v. Starbird, 243 U. S. 592; So. Pac. Ry. Co. v. Stewart, 248 U. S. 446; Erie Railroad Co. v. Shuart, 250 U. S. 465; Texas

& Pac. Ry. Co. v. Leatherwood, 250 U. S. 478.] It neces-
sarily followed from the requirement of the amendment
that the initial carrier should execute and deliver to the
shipper when it received the property for transporta-
tion, a written or printed receipt or bill of lading, that
any lawful limitation of the liability of the carrier might
be expressed in this bill of lading, and would, when so
expressed, be binding upon both parties to the contract
of carriage.   Some of these cases, particularly Texas
& Pacific Railway Company v. Leatherwood, supra, went
so far as to hold that, where a connecting carrier refuse
to receive the stock constituting the shipment without
issuing a new bill of lading, it might still take advantage
of a limitation contained in the initial contract.   These
cases cover and sustain clauses in bills of lading issued
in compliance with the Carmack amendment, (1) lim-
iting the time in which notice must be given the carrier
of loss or damage to the property included in the ship-
ment, (2) limiting the time for bringing suit against
the carrier covering such loss or damage to the ship-
ment, and (3) the agreed valuation in the bill of lading
for the purpose of fixing the rate charged for the trans-
portation.   Adams Express Company v. Croninger, su-
pra, belongs to the latter class and is one of the leading
Federal cases upon that subject.   The court, after full
discussion of the purpose of the Carmack amendment,
arrived at the conclusion that although the carrier had
no right to contract against liability for its own negli-
gence, the amount of the liability was an important ele-
ment in fixing the charge for transportation, and that
it was just and reasonable that it should be taken into
consideration in fixing that charge.   In none of the cases
we have cited is it suggested that such valuation could
be used as a device for discrimination between shippers.
Those cases sustaining contracts requiring the prompt
presentation of claims and limiting the time for the
institution of suits for the recovery of damages, pro-
ceed upon the theory that such notice and subsequent
proceedings stand upon the fact that prompt action is

or may be necessary to the preservation and production of evidence relating to such issues.

Although we might rest in security upon the opinion expressed by the Supreme Court in the Adams Express Company Case already referred to, that no power is given by the terms of the Carmack amendment enabling an interstate carrier to contract against liability for its own negligence, further reference to the terms of the act itself may not be out of place. In this respect the proviso is not without interest. We have already quoted it in this opinion.

The amendment, after requiring the carrier to give to the shipper whose property it has accepted for the purpose of transportation, a receipt or bill of lading therefor, proceeds to state that it ''shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.''

That this sentence, by its positive terms, imposes and was intended to impose upon the carrier absolute liability for all loss, damage or injury to the property delivered to it for transportation, caused by its fault, there can be no doubt. This construction can only be avoided by putting words into the mouth of Congress which it did not use and which nothing in the act indicates its intention to use. While they may, by reasonable construction, be interpreted to include only such loss or damage as should result from the negligence or fault of the other party to the contract of carriage, there is nothing in the connection in which they appear, to indicate that they are intended to make the carrier an insurer of the property during the entire period of its possession. This is made plain by the Supreme Court in the Adams Express Company Case, supra, in which the

court is careful to explain that the carrier cannot lawfully contract against liability for its own negligence. It is also emphasized by the fact that in none of the Federal cases which we have cited has the court held that it is within the power of the carrier to secure such exemption through the terms of its bill of lading. They all relate, as we have already said, either to the valuation upon which rates for transportation are fixed proportionately to the extent of the liability incurred or to the promptness of the shipper in the assertion of his claim. This is made still plainer by the provision of the act that "no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed." That this is a clear and unambiguous limitation upon the terms of the receipt or bill of lading authorized by the same amendment, carefully interposed for that very purpose, is too plain to admit of argument or of statement more simple than the words in which Congress expresses it.

Then follows the proviso, stated with equal care and simplicity, as follows: "Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." It is contended by the appellants that the word "law," as used in this proviso, refers, not to the law of the land, but to the terms of such receipt or bill of lading as the carrier may see fit to write and the shipper to receive. This is a solecism so gross that comment is unnecessary to demonstrate its absurdity. The writer of the contract is a common carrier exercising a public function which is necessarily, in many cases, a monopoly, reaching and enveloping in its tentacles every person as well as every industry in the community in which it exists. All must depend, to a greater or less extent, upon the exercise of its functions for a fair and equal opportunity in any calling involving the use of its facilities, and the common law has, during the period of its existence, developed many rules tending to secure efficiency and equality in its operation for

the common good. Among the duties which it assumes is the careful operation of its facilities in the interest of the entire public, and among the safeguards by which the common law has attempted to enforce this duty is the rule that refuses to permit it to contract with patrons that it shall be exempt from liability for any injury produced by its failure to exercise such care. This prohibition is fundamental, and the rule of care would become a mere scrap of paper were it left within the power or province of the carrier to present such a contract to its patron as a condition for the rendition of the public service which it controls, yet its right to do this is the very kernel of this controversy.

It is asserted that by this amendment, it has been enacted that just such a contract can be made. We have already noticed this theory in its application to the body of the amendment, but the author of the bill seems to have anticipated a controversy of this character and added a proviso by which it is enacted "that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." It is contended that the word "law" as used in this proviso refers to and includes any limitation of liability which the carrier may choose to insert in the receipt. The argument is that the evident intention of Congress was to withdraw the regulation of interstate commerce entirely from the domain of state legislation and to place it under Congressional control by uniform legislation covering the entire field, and that it has attempted to exercise this power by repealing all laws, both common and statutory, defining the duties of carriers, and substituting therefor their own bills of lading.

II. We cannot accede to this proposition. We think that the Carmack amendment is clear and unambiguous, carrying its purpose and meaning legibly written upon its face. Instead of repealing all those rules and safeguards which the com-

State Regulation.

mon law, as administered in the courts of the United States, has provided for the protection of shippers, it continues and safeguards them in the plainest and most unmistakable terms, which it exempts such commerce from the operation of local statutes in force in the different states through which it may pass. In this case it is unnecessary to discuss to what extent such commerce and its instrumentalities may be affected by police regulations for the protection of the lives and safety of the people of the different states in which such transportation may be conducted, or to enumerate the conditions involving the application of the principles we have endeavored to make clear. We only hold that it is not within the power of the railroad company under the Carmack amendment to make a contract exempting it from liability for damage resulting from his own negligence or unlawful act in the handling of interstate business.

We have read with some care the cases to which we have been cited in connection with this question, and have failed to discover anything in the language of the Supreme Court of the United States involving the interpretation of this important amendment, at variance with the views we have expressed, while in the Adams Express Company Case, which we consider a leading authority upon the subject, the court undoubtedly reached the same conclusion. We find among all the cases with which the excellent brief of the appellants is enriched but a single one which does not illustrate the same principle. We refer to Coleman v. Hines, 217 S. W. 602. While that case may appear, upon a casual reading, to be at variance with the views we have expressed, it really depended upon the question whether the charge in the answer that the cause of action resting upon the negligent failure of the defendant to furnish cars for the shipment within a reasonable time had been, in the final contract for the transportation, released for a valuable consideration; and the cause, which had been determined upon demur-

rer to the answer, was remanded by the Court of Appeals for the trial of that issue.

In the present case there is no suggestion in the record that this shipment did not carry the usual charge for transportation without any reference whatever to the failure of the defendant to furnish cars therefor, or to any other reduction from the regular rate charged to all others for the same or similar service.

III.   The defendant contends that there is no evidence that the plaintiff ordered cars on November 12th to be delivered for loading on the 18th of the same month. It says that no such order appears upon its order book kept for that purpose and produced in court for inspection at the trial, while the plaintiff J. F. Howell testified distinctly that the order was written in an order book resembling the one presented in the court and that this alone is sufficient to discredit his statement. Mr. Howell states that he ordered cars on that day for delivery at three stations—Columbia, Stephens and Hallsville. That he went personally to the Columbia station and there ordered the three cars in question to be delivered at Columbia on the 18th and one car to be delivered at Stephens on the same day, while he thinks that the order for the delivery of two cars at Hallsville was given by his agent operating at that place. Cars were distributed from the superintendent's office at Moberly to which they were transmitted by wire from whatever station they might have been ordered. On the 18th, the day for which the cars were ordered, the hogs were driven to the several stations from which they were to be shipped, finding the cars ready for them at Hallsville and Stephens, but no car for the hogs driven to the company's pens at Columbia, where Mr. J. F. Howell testified that he made the order himself. He also testified that there was considerable talk about the failure to have them ready and that he was put in communication over the long distance telephone with the division superintendent at Moberly

*Evidence: Date of Order.*

on that subject, but nobody connected with the railroad office had any recollection of any talk on the subject whatever, and the order book introduced in evidence shows an order entered on that day by Mr. Murry Howell for the three cars delivered at the chutes on the next day. Mr. Murry Howell was in St. Louis on that day, and could not have had any connection with this transaction. None of the office force that made this entry could remember anything about the circumstance, although it should necessarily have attracted sufficient attention to fix itself in the mind of any employee charged with a duty connected with the production of these cars. The claim on which the suit was founded was prepared and presented to the proper officer of the Railway Company on the 25th of the same month, only seven days after the alleged default on which the suit was founded. The plaintiffs were well known to the Railway Company, having done the same business at the same station for many years, and the fact that they had caused so large a shipment of animals to be gathered up and driven to the pens for shipment without any notice whatever that cars would be needed should have made some impression upon their memory.

We do not think that all the circumstances taken together destroy the effect of Mr. J. F. Howell's positive statement in evidence that he ordered these cars on November 12th for delivery for loading on the 18th of the same month, while some of them strengthen it.

We hold that the evidence was ample to authorize the court to submit the question whether or not the cars for this shipment of hogs were ordered on November 12th, and must rule the point for plaintiffs.

IV. The next point made by the defendant is that there is no evidence that he was negligent in failing to deliver the cars on the 18th of November, notwithstanding the fact that they were ordered on the 12th. It is

sufficient to say upon this point that the **Negligent Failure: Timely Order: Demand and Supply of Cars.** testimony was to the effect that three or four days was the time usually allowed in shipments of this character, and there is no suggestion in the evidence that the six days allowed by this order were not amply sufficient for the purpose. The defendant intimates that for the purpose of making a prima-facie case of negligence in that respect the evidence must take into consideration the condition of the demand and supply for cars over the entire line. A rule of this character would be entirely impracticable and prevent recovery without the prodrction of the car accounts covering it. Should this become necessary in any case the evidence is within the reach and control of the Railroad Company, which alone can produce it. It is sufficient for the plaintiffs in the first instance to show the usual and customary time for the performance of the service, and if this is incorrect, or if there is any special circumstance affecting the movement or supply of cars to any station it can be easily shown by the company. In this case the evidence is sufficient and there is nothing in the entire record showing that any such question was raised or suggested during the trial. This point also is ruled against the defendant.

V. During his examination in chief the plaintiff J. F. Howell testified as follows:

"Q. Were you acquainted with the price of hogs on the eighteenth, nineteenth and twentieth of November, 1919? A. I think so.

"MR. CLARK: He has not fixed the place or the time or shown that this witness knows anything—

"Q. Were you acquainted with the market price, at Columbia, Missouri, and National Stock Yards, at that time? A. Why, certainly I was.

"Q. Why certainly? What if any difference was there on the nineteenth of November and the twentieth of November, 1919? A. I think they called the market something like half a dollar a hundred lower.

"Q. Fifty cents a hundred lower? A. Yes, sir."

On cross-examination he testified that he was not

at the National Stock Yards on either the 19th or 20th of November and got his information from the "Stock Reporter." The defendant then said: "I move that all this witness's testimony with reference to the market at St. Louis be stricken out, for the reason that it shows, on cross-examination, that he was not at the National Stock Yards," which was overruled by the court. On further examination the witness testified that his business required him to and he did keep posted upon the price of hogs at the National Stock Yards each day by reports published in the Stock Yards Reporter each day and letters from commission firms at that point.

That the market price of an article of commerce bought and sold in open markets established, maintained and used for that purpose is a fact to be proven like any other fact of a similar nature, is too plain to be reduced by argument to simpler terms. That the live stock markets are necesarily connected with stock yards where the animals may be brought together, held and exhibited for that purpose is equally plain, and it follows that the market price of live stock is fixed by the manifold transactions occurring from day to day in these great centers of trade. The dealer is there in constant touch by wire with the local trade throughout the country and public journals are printed and sent to local dealers and producers throughout the territory covered by its operations. The prices are established, regulated and controlled by the aggregate of their transactions, and it is evident that the opinions which they form from all these sources and upon which they rely in every deal is evidence of the state of the market.

In this case the witness J. F. Howell had been a dealer in the same market for thirty years, while his son had been associated with him in that business for twelve years. They were both experienced in its conditions and fluctuations. At the time of this transaction this witness was engaged in the purchase of stockers and feeders at the producing end, while his son, Mr. Murry Howell, was operating at the selling end. The intelligent expendi-

ture of their money in Boone County demanded the same knowledge as did the taking of it in at the National Stock Yards, and both operations required the same intimate knowledge of the state of the market, and the opinion of J. F. Howell in that respect was founded upon a knowledge and experience as broad as that of Murry Howell at the Stock Yards, whose competency is not questioned. We can see no reason for discrimination between them and think that the opinion of the former, founded upon knowledge acquired through the usual channels at Columbia, was entitled to equal consideration with the testimony of Murry Howell, who might have had time and opportunity to talk personally with some other dealer or dealers.

Nor do we think the defendant has suffered from the admission of this testimony. The witness from whom it was elicited testified that in his opinion the depreciation in the price of such hogs at the National Stock Yards between November 19th and November 20th had been fifty cents per hundred weight, while Murry Howell, who was present at the Stock Yards on both days, put it from fifty to seventy-five cents per hundred weight. No attempt is made by defendant to minimize the latter statement. It introduced no evidence on the subject, while the jury adopted the smaller estimate.

We find no error in the record, and the judgment of the Circuit Court for Boone County is affirmed. *Small* and *Lindsay, CC.,* concur.

PER CURIAM:—The foregoing opinion of Brown, C., is adopted as the opinion of the court. All of the judges concur; *Graves, P. J.,* as to all except what is said as to the testimony of J. F. Howell on the matter of prices at the St. Louis market.